**Muffet MEDLOCK, d/b/a Miss Muffet's Playhouse, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. SACV02–219–JVS(MLGX).**

United States District Court,
C.D. California,
Southern Division.

Oct. 30, 2003.

A. Lavar Taylor, Robert S. Horwitz, A. Lavar Taylor Law Offices, Santa Ana, CA, for Plaintiff.

Richard G. Stack, Asst. U.S. Atty., Office of U.S. Attorney Tax Division, Los Angeles, CA, for Defendant.

## STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

SELNA, District Judge.

The Motion for Summary Judgment filed by defendant, the United States of America, came on for decision before the Court, the Honorable James V. Selna, United States District Judge, presiding, on September 8, 2003. Based upon the papers filed in support of and in opposition to the motion, and all matters properly part of the record, the Court makes the following Statement of Uncontroverted Facts and Conclusions of Law:

1. Plaintiff Muffet Medlock, d/b/a Miss Muffet's Playhouse ("plaintiff" or "Medlock") owns and operates a licensed daycare business, located in Anaheim, California.

2. On *March 1, 2002*, plaintiff commenced this action by filing a "Complaint for Judicial Review of Administrative Determination Following Request for Hearing Upon Issuance of Final Notice of Intent to Levy Under Due Process Appeal Provisions (26 U.S.C. §§ 6320, 6330)" ("Complaint"). Plaintiff filed this action to obtain judicial review of the administrative determination of the Internal Revenue Service ("IRS" or "Service") denying her Collection Due Process ("CDP") appeal from the "Final Notice: Notice of Intent to Levy and Notice of Your Right to a Hearing," Letter 1058 ("Notice of Intent to Levy") dated *February 27, 2001* that the IRS had sent to her in the total amount of $25,582.50. (*Exhibit No. 1* attached to Complaint, pp. 9–10).[1]

3. The IRS issued the Notice of Intent to Levy regarding the unpaid Federal Unemployment Tax Act ("FUTA") liabilities incurred by Medlock for the years 1997, 1998, and 1999 (reportable on Form 940), and the unpaid withheld income taxes and Federal Insurance Contribution Act ("FICA") liabilities incurred by Medlock for the periods ended December 31, 1998, March 31, 1999, June 30, 1999, and Sep-

---

1. Unless otherwise indicated, all references herein to numerical exhibits pertain to the exhibits attached to the Complaint, whereas references to alphabetical exhibits pertain to the exhibits attached to the declarations filed in support of defendant's Motion for Summary Judgment.

tember 30, 1999 (reportable on Form 941) ("subject tax liabilities").

4. On or about *March 27, 2001,* Medlock filed with the IRS a Request for a Collection Due Process Hearing, IRS Form 12153, with attachments, in response to the Notice of Intent to Levy. (Exhibit No. 2 attached to Complaint, pp. 11–18; Janice Rich Decl., ¶ 2).

5. On or about *May 16, 2001,* Appeals Officer Janice Rich of the IRS Appeals Office in Riverside, California was assigned to handle Medlock's CDP Appeal. (Rich Decl., ¶ 2).

6. Appeals Officer Rich is an impartial officer pursuant to 26 U.S.C. § 6330(b)(3), who had no prior involvement with respect to Medlock's subject tax liabilities before she handled the CDP Appeal. (Rich Decl., ¶ 4).

7. Appeals Officer Rich's review of the Service's files in this matter indicates that the IRS has complied with the requirements of all applicable laws and administrative procedures regarding Medlock's subject tax liabilities. In connection with handling the CDP Appeal, Ms. Rich reviewed the Service's computerized transcripts of account pertaining to Medlock for the subject tax liabilities. Those transcripts reflect that: (a) the subject tax liabilities were properly and timely assessed against Medlock; (b) the assessments of the subject tax liabilities were based upon tax amounts that Medlock reported as due and owing on Forms 940 and 941 that she filed with the IRS; (c) the IRS gave Medlock "notice and demand" for payment of the subject tax liabilities within sixty (60) days after the respective assessment dates, as required by 26 U.S.C. § 6303(a); and (d) on *February 27, 2001,* the IRS sent to Medlock, by certified mail, a Notice of Intent to Levy regarding the subject tax liabilities, along with notice of Medlock's right to file a CDP Appeal and to have an appeals hearing regarding the

Notice of Intent to Levy, as required by 26 U.S.C. §§ 6330(a) and 6331(d)(2). (Rich Decl., ¶ 5).

8. During Appeals Officer Rich's consideration of the CDP Appeal, although not required at this stage of the collection process, Ms. Rich also determined that there was a possible levy source in the event that she denied Medlock's appeal and the IRS later levied on Medlock's property. *See e.g.,* 26 U.S.C. §§ 6331(f) and (j) (pertaining to uneconomical levies and requirement to investigate status of property before levy). Namely, the IRS had identified a business checking account, account no. 12037346, that Medlock maintained with Farmers & Merchants Bank. Appeals Officer Rich learned about that bank account from Revenue Officer Francine Huck, who had been assigned to collect the subject tax liabilities immediately before Medlock filed the CDP Appeal. Revenue Officer Huck informed Ms. Rich that, as of early 2000, substantial funds were being deposited into that account. (Rich Decl., ¶ 6).

9. Medlock raised only the following issue, and no others, in her CDP Appeal dated March 26, 2001, which the IRS received on March 27, 2001:

"Miss Muffets Playhouse has experienced difficulties with making payroll tax deposits in the past due to numerous factors including problems with outside payroll services. Miss Muffets Playhouse has made a concerted effort to bring itself into compliance and a levy on its accounts at this time would compound the tax problems already facing this struggling business."

(Exhibit No. 2 attached to Complaint, p. 12; Rich Decl., ¶ 7).

10. Joyce E. Cheng subsequently sent to Ms. Rich's attention at the IRS Appeals Office in Riverside, California a letter dated *June 12, 2001. (Exhibit No. 3* attached

to Complaint, pp. 19–20). In that letter, Medlock proposed that this CDP Appeal be resolved by Medlock transferring the assets of her day care business to a third party (Medlock's mother), who then would operate the business. The letter added that such a transfer would require the IRS to issue a Certificate of Discharge of the tax liens so that the buyer would obtain clear title to the assets and would require the cooperation of the Employment Development Department ("EDD"), which allegedly holds "blanket liens" against the assets of the business. Ms. Cheng further stated in the June 12, 2001 letter that IRS levy action would cause the day care center to close and would have "a far reaching effect beyond the immediate taxpayer, leaving many families without the needed daycare services." (Rich Decl., ¶ 8).

11. On *July 31, 2001*, Appeals Officer Rich met with attorney A. Lavar Taylor at the IRS Appeals Office in Riverside in order to discuss Medlock's CDP Appeal. At the CDP meeting, Ms. Rich informed Mr. Taylor that Medlock was not remaining current in the payment of her Federal employment tax liabilities. In particular, Ms. Rich told Mr. Taylor that, while Medlock had timely filed her Form 941, Employer's Quarterly Federal Tax Return, for the quarterly period ended March 31, 2001, she had not made sufficient Federal tax deposits during that quarter to cover the actual taxes shown as due and owing on her Form 941 for the first quarter of 2001 and that she had not made a payment with that return. Ms. Rich also told Mr. Taylor that she did not know whether Medlock had made sufficient Federal tax deposits to cover her employment tax liabilities for the second quarter of 2001, and that her Form 941 for that quarter was due later that day, i.e., on July 31, 2001. (Rich Decl., ¶ 9).

12. During the July 31, 2001 CDP meeting between Appeals Officer Rich and Mr. Taylor, they discussed various collection alternatives to levy, such as an installment payment agreement or an offer in compromise. Mr. Taylor told Ms. Rich that an installment payment agreement was "not possible" because Medlock was having difficulty paying her employment tax liabilities as well as other creditors. Mr. Taylor and Ms. Rich then discussed the possibility of an offer in compromise. Mr. Taylor explained to Ms. Rich that Medlock wanted to sell her licensed day care business to her mother and to use the proceeds from such a sale to fund an offer in compromise. Mr. Taylor added that the State of California's licensing requirements must be met before Medlock could sell the day care business. As a result of delays in the licensing and sales approval process, that "pending sale" had been in progress for a long time. (Rich Decl., ¶ 10).

13. At the July 31, 2001 CDP meeting, Appeals Officer Rich informed Mr. Taylor that the IRS would not issue a determination letter at that time if Medlock satisfied the following conditions: (a) she timely filed her Form 941, Employer's Quarterly Federal Tax Return, for the second quarter of 2001 (which was due on July 31, 2001); (b) she paid all of the tax shown as due on that return, including any accrued penalties; (c) she made timely federal tax deposits for the third quarter of 2001; and (d) she timely filed her Form 941 for the third quarter of 2001. Appeals Officer Rich then told Mr. Taylor that, after Medlock had been in compliance with her Federal employment tax obligations for two consecutive quarters, she could submit to the IRS an offer to compromise her tax liabilities, provided that Medlock also filed all of her delinquent Federal income tax returns, and that any income tax liabilities due and owing be included in the proposed compromise. Mr. Taylor agreed that Ms. Rich's proposal was "more than fair."

Near the end of their July 31, 2001 CDP meeting, Mr. Taylor informed Ms. Rich that Medlock would remain current in the payment of her employment tax liabilities for the second and third quarters on 2001 and that, in the meantime, Medlock would sell her day care business. (Rich Decl., ¶ 11).

14. After the July 31, 2001 CDP meeting between Appeals Officer Rich and Mr. Taylor, Medlock remained current in the payment of her employment taxes for two consecutive quarters, i.e., the second and third quarters of 2001. (Rich Decl., ¶ 12).

15. On *October 24, 2001*, Appeals Officer contacted Mr. Taylor by telephone, since she had not received an offer in compromise from Medlock, as they had discussed at their July 31, 2001 CDP meeting. During that conversation, Ms. Rich told Mr. Taylor that if Medlock did not submit an offer in compromise to the IRS or enter into an installment payment agreement in the very near future, the IRS would be compelled to issue an adverse determination letter regarding Medlock's CDP Appeal. (Rich Decl., ¶ 13).

16. After October 24, 2001, Appeals Officer Rich did not receive any further contact from Medlock or her representatives regarding either the CDP appeal or possible collection alternatives. Accordingly, by letter dated *February 1, 2002*, entitled

"Notice of Determination Concerning Collection Action(s) Under Section 6320 and/or 6330" ("Determination Notice"), the IRS Appeals Office informed Medlock that it had denied her CDP Appeal and that Medlock had thirty (30) days from the date of such Notice to file a complaint for redetermination of the CDP Appeal in the appropriate United States District Court. (*Exhibit No. 6* attached to Complaint, pp. 25–27; Rich Decl., ¶ 14).

17. In the Determination Notice, the Appeals Office upheld the Service's decision to levy on Medlock's business assets. The Determination Notice also found that the IRS had met the "requirements of various applicable law or administrative procedures." The Notice stated that "you failed to present any reasonable alternatives to the levy actions proposed by collections," and that, as a result, "your expressed concerns do not outweigh the need for the efficient collection of tax, and the levy action proposed is not more intrusive than necessary." (Exhibit No. 6 attached to Complaint, p. 26; Rich Decl., ¶¶ 15–16).[2]

18. Because Medlock had failed to remain current in the payment of her employment tax liabilities for the first quarter of 2001 and she had failed to submit an offer in compromise to the IRS, or to propose and implement any other realistic collection alternative, Appeals Officer Rich

---

2. Attachment—3194 to the Determination Notice (Exhibit No. 6, Complaint, p. 27) gives detailed reasons for the Service's denial of plaintiff's CDP appeal. It states, in pertinent part:

" * * * Since you were not current with regard to tax obligations at the time collection was being attempted on the above past [due] liabilities, and you continued to accrue additional liabilities in subsequent tax periods, the notice of intent to levy became the only collection method available." One of the requirements of the due process hearing is to address whether all the requirements have been met by the govern-

ment under IRC Section 6330 in delivery of the levy notice. In reviewing the proposed intent to levy notice, it has been determined that those requirements have been met.

During Appeals consideration, you indicated that your business was in the process of being sold, but had not been finalized as [of] yet, pending state qualifications for the new buyer on the childcare business. During Appeals consideration, the business was not sold. During Appeals consideration, you did come into compliance for two consecutive quarters so that an offer in compromise could be submitted. No offer was received during Appeals consideration."

determined that the Service's proposed collection actions should be sustained. (Rich Decl., ¶ 17).

19. Appeals Officer Rich further concluded that a levy on Medlock's property was no more intrusive than necessary and was appropriate to protect the government's interest in collecting the liabilities owed. Ms. Rich also concluded that the proposed levy action was not overly intrusive, having balanced the needs of the government and the concerns of Medlock. (Rich Decl., ¶ 18).

20. On or about *January 29, 2002*, Appeals Officer Rich completed an Appeals Transmittal Memorandum and Case Memo in this case. The Appeals Case Memo sets forth in more detail the factual and legal basis for the decision that the IRS made in the Determination Notice to deny Medlock's CDP Appeal. (Rich Decl., ¶ 19, and *Exhibit A* attached thereto).

21. On *March 1, 2002*, plaintiff timely filed the Complaint, contesting the February 1, 2002 Determination Notice. The Complaint consists of three (3) causes of action.

22. In the First Cause of Action (Complaint, ¶¶ 14–17), plaintiff alleges that the Appeals Officer failed to consider her proposed alternative to the levy. Specifically, plaintiff contends that the Determination Notice failed to address her request that she be permitted to sell the day care business to her mother, in alleged violation of 26 U.S.C. § 6330(c)(3)(B). (Complaint, ¶ 16). Plaintiff also contends that the Determination Notice failed to address the effect of the levy action on clients of the business, as allegedly required by 26 U.S.C. § 6330(c)(3)(B).

23. In the Second Cause of Action (Complaint, ¶¶ 18–22), plaintiff alleges that the Appeals Officer failed to obtain verification from the Secretary of Treasury (or his delegate) that the requirements of any applicable law and administrative procedure had been met, including the provisions of 26 U.S.C. § 6331(j).

24. Finally, in the Third Cause of Action (Complaint, ¶¶ 23–24), plaintiff alleges that the Appeals Officer abused her discretion by failing to consider whether the levy would "produce any net proceeds in light of the blanket liens held by the California Development Department on [her] assets" and in failing to consider the impact of the levy on the customers of the day care center.

25. On *July 2, 2002*, defendant filed its answer to the Complaint. In its Answer, defendant denied the operative allegations of plaintiff's Complaint and asserted the "Additional Defenses" of variance and that the Third Cause of Action failed to state a claim upon which relief can be granted, to the extent plaintiff alleged that the IRS was required to consider the effect of the levy upon the customers of the day care center. *See* 26 U.S.C. § 6330(c)(2)(A).

## BACKGROUND FACTS

26. Medlock has a long history of failing to pay the employment taxes incurred by her day care business. In addition to owing unpaid employment tax liabilities for the subject periods, Medlock had incurred employment tax liabilities for numerous additional tax periods at the time of the CDP hearing, so that the unpaid balance of Medlock's *assessed* tax liabilities was *$199,901.58*, rather than merely the *$25,582.50* of unpaid assessed and accrued tax liabilities listed in the Service's Notice of Intent to Levy dated February 27, 2001. Appeals Officer Rich considered Medlock's incurrence of those additional liabilities in making her determination in this case. (Rich Reply Decl., ¶ 3.a., Exhibit A, and *Exhibits J, K, L, and M,* Requests for IDRS Terminal Action and/or IRS transcripts of accounts pertaining to Medlock dated June 28, 2001, July 19, 2001, July 31, 2001, and October 11, 2001).

27. The Service opened a collection file regarding Medlock for the subject tax liabilities on or about *January 31, 1998.* (Rich Reply Decl., ¶ 3.b., *Exhibit C,* p. 1, computerized Collection History regarding Medlock printed on *June 21, 2001,* first "Action" entry dated January 31, 1998, and *Exhibit N,* facsimile transmittal sheet dated June 21, 2001 with which Revenue Officer Francine Huck transmitted computerized Collection History regarding Medlock to Appeals Officer Rich).

28. In a facsimile transmission dated *March 11, 1998,* Earline McKenzie of Ameriquest Mortgage Company in Riverside requested the IRS to provide her with a "payoff demand" for certain Federal tax liens filed against Medlock, which she had attached to the facsimile cover sheet. (Rich Reply Decl., ¶ 3.c., *Exhibit D,* Fax Cover Sheet dated March 11, 1998 and attached notices of Federal tax liens, and Exhibit C, p. 3, first "Action" entry dated April 13, 1998).

29. On *March 24, 1998,* IRS Revenue Officer H. Woods transmitted to Earline McKenzie, by facsimile, a Notice of Federal Taxes Due, IRS Form 10492, regarding the unpaid employment tax liabilities which Medlock then had incurred. (Rich Reply Decl., ¶ 3.d., *Exhibit E,* Fax Transmittal Cover Sheet dated March 24, 1998 and attached Notice of Federal Taxes Due, Exhibit C, p. 3, "Action" entry dated April 13, 1998).[3] The Notice of Federal Taxes Due reflects that, as of March 31, 1998, Medlock had incurred unpaid employment tax liabilities in the total amount of *$130,091.76* for various tax periods from the period ended September 30, 1992 through the period ended March 31, 1997.

30. On *June 4, 1998,* Medlock's attorney Lavar Taylor met with Revenue Officer Woods at the IRS offices, as the parties previously had arranged, in order "to discuss the customer [taxpayer's] repayment proposal." (Rich Reply Decl., ¶ 3.a., and Exhibit C, p. 5, "Action" entry dated June 4, 1998).

31. The IRS Collection History and collection file reflect that numerous additional contacts after June 4, 1998 were made between Mr. Taylor's offices and IRS Revenue Officers assigned to collect Medlock's unpaid employment tax liabilities. Those contacts centered around Medlock's efforts to repay her delinquent employment tax liabilities, to file past due employment tax returns, and to remain current in the payment of her Federal employment tax liabilities as they accrued. (Rich Reply Decl., ¶ 3.b., and Exhibit C attached thereto).

32. By letter dated *August 17, 1998,* Mr. Taylor's firm submitted to Revenue Officer Woods Medlock's original Form 941 returns for the quarters ended December 31, 1997, March 31, 1998, and June 30, 1998. The August 17, 1998 letter also refers to the fact that Medlock's return for the period ended June 30, 1998 erroneously reports "deposits in the full amount of taxes owed, however Ms. Groton [Medlock] has just informed me that Paychex in fact did not make the required deposits as she had thought." (Rich Reply Decl., ¶ 3.e., *Exhibit F,* letter dated August 17, 1998 from Joyce L. Cheng to Revenue Officer H.A. Woods, and Exhibit C, pp. 8–9, "Action" entry dated August 17, 1998).

33. An overarching theme found in correspondence from Medlock's counsel to the IRS concerns Medlock's proposal to sell her day care business to her mother and to use the proceeds to partially satisfy her

---

**3.** Ms. McKenzie apparently was employed by Ameriquest Mortgage, which was handling the then pending foreclosure sale of the real property on which Medlock's day care business operated. (Rich Reply Decl., ¶ 3.b., and Exhibit C, p. 5, "Action Entry" dated June 4, 1998).

tax debts. Medlock has been suggesting that proposal for almost *five (5) years* now, including during the nearly sixteen (16) month duration of this CDP litigation. (Rich Reply Decl., ¶ 4, and *Exhibit P*, "Case Activity Records" entry dated June 20, 2001).

34. By letter dated *October 28, 1998,* Medlock first outlined her proposal to sell her day care business and to use the proceeds to pay her tax debts. (Rich Reply Decl., ¶ 3.g., *Exhibit H*, letter dated October 28, 1998 from Joyce Cheng to Revenue Officer H.A. Woods, and Exhibit C, pp. 12–13, "Action" entry dated November 3, 1998).[4]

35. A collection history entry dated *December 16, 1998* reflects that Revenue Officer T. Jones[5] and Mr. Taylor discussed by telephone, from Mr. Taylor's hospital bed, the business sale proposal made in Ms. Cheng's letter dated October 28, 1998. During that conversation, Mr. Taylor also stated that he needed "to work something out with [the] EDD about the sale of the business," and that "[t]he sale would require EDD's approval due to the sensitivity of a daycare license." (Rich Reply Decl., ¶ 3.b., and Exhibit C, pp. 14–15, "Action" entry dated December 16, 1998).

36. Revenue Officer Jones next spoke with Mr. Taylor by telephone on *January 20, 1999,* as reflected by the Collection History entry "TCM to POA" [telephone call made to power of attorney]. (Rich Reply Decl., ¶ 3.b., and Exhibit C, pp. 16–17, "Action" entry dated January 20, 1999). During that contact, Mr. Taylor stated that "there has been a hold up with the person who is to interview and give the okay for tp's [taxpayer's] mom to receive the daycare provider license," but that he did not anticipate any problem in obtaining such approval. Mr. Taylor added that the "original plan [to sell Medlock's business] still remains," but that "if things are not going as planned, he has already advised his client of the necessity to discontinue business and submit an OIC [offer-in-compromise]." (Rich Reply Decl., ¶ 3.b., and Exhibit C, p. 17, continuation of "Action" entry dated January 20, 1999).

37. On *January 22, 1999,* Revenue Officer Jones received a voicemail message from Joyce Cheng of Mr. Taylor's office. In that message, Ms. Cheng stated that her firm had been in contact with Medlock and was advised that Medlock then was "waiting for the state worker to do a 'spontaneous' inspection of the [day care] facility" and that such inspection "cannot be an

---

4. That letter states, in pertinent part:

"Ms. Groton has decided to take our advice and sell the business and will work as an employee." Ms. Groton's mother is going to obtain the necessary licenses to acquire the business. Thereafter Ms. Groton's mother will be responsible for tax compliance. We will obtain an appraisal of the assets of the business in anticipation of requesting lien discharges from the IRS. Once the business is transferred, we will be submitting an offer in compromise to deal with the remaining liabilities owed by Ms. Groton. We anticipate that it will take approximately 30–60 days to transfer the business.

I would also point out at this time that Ms. Muffet's Playhouse has outstanding tax liabilities with the EDD [Employment Development Department]. We will be working with the EDD as well in resolving those tax liabilities in the same manner. Ms. Groton will be borrowing money from family in order to fund the offers in compromise to the IRS and the EDD. Since the funds will be limited we will need to coordinate our efforts with both taxing authorities." (emphasis supplied).

5. The Collection History reflects that Medlock's collection file was reassigned to Revenue Officer Jones, whose employee number is 33012017, on or about *November 13, 1998.* (Rich Reply Decl., ¶ 3.b., and Exhibit C, p. 13, first "Action" entry dated November 13, 1998).

appointment, but must be completed within 90 days of licensing." Ms. Cheng added that a new license had been issued in December 1998, so that the inspection process should be completed by "3/98 [sic— 3/99] at the latest" and that "the only thing that can delay things is if the inspector finds problems which will require a fu [follow-up] 'spontaneous' inspection." (Rich Reply Decl., ¶ 3.b., and Exhibit C, p. 17, "Action" entry dated January 22, 1999).

38. On *March 4, 1999,* Revenue Officer Jones received a package that Medlock's representatives had left at the taxpayer service counter, which was date-stamped February 19, 1999. (Rich Reply Decl., ¶ 3.b., and Exhibit C, pp. 19–20, "Action" entry dated March 4, 1999). That package contained a cover letter dated *February 18, 1999,* from Ms. Cheng to Revenue Officer T.R. Jones and financial and bank account information regarding Medlock that Ms. Jones had been requesting since January 22, 1999. (Rich Reply Decl., ¶ 3.f., *Exhibit G,* cover letter dated February 18, 1999 from Ms. Cheng to Revenue Officer T.R. Jones, with attachments, *Exhibit O,* Referral Request for Collection Due Process (CDP) Hearing, IRS Form 12153–A dated May 1, 2001, and Exhibit C, pp. 18– 20, "Action" entries on Collection History dated January 22, 1999 and March 4, 1999).[6]

39. On or about *September 10, 1999,* Medlock's collection file was reassigned to Revenue Officer Francine Huck, whose employee number is 33012051 (Rich Reply Decl., ¶ 3.b., and Exhibit C, p. 22, first "Action" entry dated September 10, 1999).

40. According to the Collection History, on *November 3, 1999,* Revenue Officer Huck placed a telephone call to Medlock's representative and left a message for him to return her call. (Rich Reply Decl., ¶ 3.b., and Exhibit C, p. 24, "Action" entry dated November 3, 1999).

41. On or about *December 21, 1999,* Revenue Officer Huck sent a letter to the taxpayer and to Mr. Taylor, requesting that they come to the IRS offices on February 1, 2000 for an appointment. (Rich Reply Decl., ¶ 3.b., and Exhibit C, pp. 25– 26, "Action" entry dated December 21, 1999).

42. The Collection History reflects that, on *February 1, 2000,* Revenue Officer Huck received a telephone call from Mr. Taylor's office. During that conversation, personnel at Mr. Taylor's office stated that they needed to reschedule the appointment which had been set for that day to February 15, 2000 at 9:00 a.m. because they thought that Medlock's business had been sold and they needed to secure updated financial information and determine if Ms. Medlock still was in business. (Rich Reply Decl., ¶ 3.b., and Exhibit C, p. 26, "Action" entry dated February 1, 2000).

43. During a *February 15, 2000* meeting between Mr. Taylor and Revenue Officer Huck held at her offices, Mr. Taylor stated that Medlock still was in business and that the "EDD will not approve her mother to buy [the] business." Mr. Taylor added that he had "advised Ms. Groton [Medlock] to submit an offer in compromise to the IRS due to her 'inability to full pay [her tax liabilities] before CSEDs

6. In the February 18, 1999 cover letter, Ms. Cheng stated:
"We have been informed by Ms. Groton that the state inspection took place a few weeks ago; however, due to an error on the part of the inspector, a return visit was necessary last week. The state is now per- forming a background check on Ms. Groton's mother. Ms. Groton said the state guaranteed her the process would be complete within 60 days and she will receive a letter regarding their determination."
(emphasis supplied).

[Collection Statute Expiration Dates] expire.'" (Rich Reply Decl., ¶ 3.b., and Exhibit C, p. 27, "Action" entry dated February 15, 2000).

44. By the spring of 2000 (and even earlier), the IRS had identified a possible levy source belonging to Medlock—a business checking account, account no. 12037346, maintained with Farmers & Merchants Bank. (Rich Decl., ¶ 6).

45. By letter dated *April 18, 2000,* Medlock provided monthly banking statements and other documents to Revenue Officer Huck. (Rich Reply Decl., ¶ 3.h., and *Exhibit I,* letter dated April 18, 2000 from Joyce Cheng, to Mrs. F. Huck, with attached documents, including monthly bank account statements for the periods ended January 31, 2000 and February 29, 2000). Those bank statements reflect that Medlock made average monthly deposits into the account from *January 1, 2000 to February 29, 2000* of about *$14,250.00,* that the total deposits made were about *$28,500,* and that the average monthly ending balance during that period was about *$2,540.00.*

46. In *April of 2000,* Medlock submitted an offer in compromise to the IRS, in which she proposed that the IRS accept the sum of $10,000 in full satisfaction of her unpaid employment tax liabilities for all tax quarters from the period ended December 31, 1992 to September 30, 1999. (Rich Reply Decl., ¶ 3.h., Exhibit I, Form 656, Offer in Compromise, attached to April 18, 2000 letter, and Exhibit C, p. 30, "Action" entry dated April 19, 2000).

47. The Service, however, eventually returned that offer to Medlock as "unprocessable" because she had failed to file Form 941 tax returns for the quarterly periods ended March 30, 2000 and June 30, 2000. (Rich Reply Decl., ¶ 3.h., Exhibit A, p. 3, Exhibit C, pp. 32–33, "Action" entry dated August 4, 2000, and Exhibit O).

48. On *February 27, 2001,* due to Medlock's continued failure to timely file employment tax returns and to pay the taxes shown as due on those returns, the IRS issued the Notice of Intent to Levy to Medlock for the subject periods. Thereafter, on *March 26, 2001,* Medlock filed her CDP Appeal.

49. After Medlock filed the CDP Appeal, her collection file for the subject tax liabilities was transferred to the IRS Office of Appeals.

50. On about *April 30, 2001,* Revenue Officer Huck summarized the facts of this case, shortly before her unit transferred Medlock's collection file to the IRS Appeals Office for consideration of the CDP Appeal:

"Taxpayer is unable to stay current and make installment agreement on past due liabilities." Taxpayer has been non-compliant since 1992. Previous periods [were] closed [as] hardship. Taxpayer recently submitted an offer in compromise dated 2–14–2000, but [it] was unprocessable and sent back to taxpayer due to 01 200003 and 200006 [Forms 941 for quarters ended March 31, 2000 and June 30, 2000] were not filed and all Federal Tax deposits were not made. Taxpayer signed up with [P]aychex, but never deposited money so [P]aychex could make Federal Tax Deposits on time or at all and file returns. This is an ongoing problem.

The business is a struggling day care center per POA [Power of Attorney] Lavar Taylor. POA wants to work with RO [Revenue Officer]. He has told taxpayer that the best solution is to sell the business. I suggested this also. POA submitted CDP due to a levy issued at this time would only compound the tax problems already facing the struggling business. POA to call 5/3/2001 on whether taxpayer to sell business. I

will try to work with the POA again, but if no solution then [I will] forward [case] to appeals."

(Rich Reply Decl., ¶ 3.b., and Exhibit C, p. 41, "Action" entry dated *April 30, 2001).*

51. Any conclusion of law deemed more appropriately to be a finding of fact is incorporated herein as a finding of fact.

## CONCLUSIONS OF LAW

### *The Statutory Scheme for Collection Due Process Appeals*

1. As part of the IRS Restructuring and Reform Act of 1998, Pub.L. 105–206, § 3401, 112 Stat. 685, 746, Congress enacted Code sections 6320 (pertaining to lien notices) and 6330 (pertaining to levies) to provide due process protection for taxpayers in collection matters. *Goza v. Commissioner,* 114 T.C. 176, 179, 2000 WL 283864 (2000).

2. Section 6330(a) generally requires the IRS to provide written notice to the taxpayer of its intent to levy on the taxpayer's property at least 30 days prior to the levy. The IRS also must inform the taxpayer of his right to a hearing with the Appeals Office, which must be requested within 30 days from the date of the notice. 26 U.S.C. §§ 6330(a)(3)(B) and 6330(b)(1); Treas. Reg. § 301.6330–1(a)(1), 26 C.F.R.

3. A CDP hearing shall be held before an IRS Appeals Officer who is impartial and has had no prior involvement with the case. 26 U.S.C. §§ 6330(b)(1) and (b)(3).

4. The Appeals Officer presiding over the CDP hearing first must verify that "the requirements of any applicable law or administrative procedure have been met." 26 U.S.C. § 6330(c)(1). Section 6330(c)(1), however, does not require the Appeals Officer to rely on any document for verification. *Kuglin v. Commissioner,* T.C. Memo.2002–51, 2002 WL 264918 (U.S.Tax Ct.). Rather, as long as the Appeals Officer relies upon transcripts of account which contain the information required by Treas. Reg. § 301.6203–1, 26 C.F.R., i.e., the taxpayer's identity, the type of tax, the tax period, and the amount of the assessment, such reliance does not constitute an abuse of discretion. *Id. See also Foster v. United States,* 2002 WL 1396772, *3, 89 A.F.T.R.2d 2002–2927, 2002–2 USTC ¶ 50,469 (D.Nev. May 10, 2002) ("The local IRS office provided the hearing officer with a transcript of plaintiff's account.* * * The hearing officer could rely on such a transcript for § 6330(c)(1) verification"), *citing, Huff v. United States,* 10 F.3d 1440, 1446–47 (9th Cir.1993) and *Hughes v. United States,* 953 F.2d 531, 538–40 (9th Cir.1992).

5. Section 6330(c) prescribes the matters that may be raised by a taxpayer at an Appeals Office due process hearing. In general, the taxpayer may raise at the collection due process hearing "any relevant issue relating to the unpaid tax or the proposed levy," including "challenges to the appropriateness of collection actions" and "offers of collection alternatives," such as installment payment agreements and offers in compromise. 26 U.S.C. §§ 6330(c)(2)(A)(ii) and (iii). The taxpayer, may challenge "the existence or amount of the underlying tax liability" only "if he did not receive any statutory notice of deficiency for such tax liability or did not otherwise have an opportunity to dispute such tax liability." 26 U.S.C. § 6330(c)(2)(B).

6. After a hearing is held, the IRS Appeals Office issues a determination notice as to whether the proposed collection action should proceed. The Notice of Determination must consider the verification required by 26 U.S.C. § 6330(c)(1) and the issues raised under 26 U.S.C. § 6330(c)(2). *See* 26 U.S.C. §§ 6330(c)(3)(A) and (B). The Appeals Officer also must determine "whether any proposed collection action

balances the need for efficient collection of taxes with the legitimate concern of the person that any collection action be no more intrusive than necessary." 26 U.S.C. § 6330(c)(3)(C).

7. Within 30 days after the Appeals Office makes a determination of a collection due process appeal under Section 6330(c), the taxpayer may file an action for judicial review of the determination to the United States Tax Court, if it has jurisdiction over the underlying type of tax, e.g., income, estate, or gift taxes. If the Tax Court does not have jurisdiction over the underlying type of tax, e.g., employment taxes, the taxpayer may file the complaint in the District Court. 26 U.S.C. § 6330(d)(1)(B). *See Berkey, P.C. v. Dept. of Treasury,* 2001 WL 1397680, *2, 88 A.F.T.R.2d 2001–6530 (E.D.Mich.2001).

8. In seeking District Court review of the Notice of Determination, the taxpayer only can request the court to consider an issue that was raised in the CDP hearing. Treas. Reg. § 301.6330–1(f)(2) Q & A–F5, 26 C.F.R. (2002).

■ 9. Although Section 6330 is silent about the standard of review to be utilized in reviewing the Service's administrative determinations, the legislative history addresses the subject in detail. In general, the Court will review the determination on a *de novo* basis "where the validity of the underlying tax liability is at issue." *Goza,* 114 T.C. at 181–82, *quoting,* H. Conf. Rep. 105–599, at 266 (1998). "However, where [as here], the validity of the underlying tax liability is not properly at issue, the Court will review the Commissioner's administrative determination for abuse of discretion." *Id.,* at 182–83, 2000 WL 283864. *See also Pikover v. United States,* 2001 WL 1346670, *3, 88 A.F.T.R.2d 2001–6497, 2001–2 USTC ¶ 50,702 (C.D.Cal. Aug. 21, 2001) (Manella, J.) ("The court reviews a Notice of Determination for abuse of discretion where the amount of the underly-

ing tax liability is not properly part of the appeal"); *AJP Management v. United States,* 2000 WL 33122693, *1, 87 A.F.T.R.2d 2001–347 (C.D.Cal. Nov. 27, 2000) (Stotler, J.) (same).

■ 10. An "abuse of discretion" is a "plain error," namely, "discretion exercised to an end not justified by the evidence, a judgment that is clearly against the logic and effect of the facts as are found." *Id.,* at *2, *citing, Wing v. Asarco, Inc.,* 114 F.3d 986 (9th Cir.1997).

### Standard for Summary Judgment

11. Summary judgment is appropriate only where the record, read in the light most favorable to the non-moving party, indicates that "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Material facts are those necessary to the proof or defense of a claim, and are determined by referring to substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

12. The Court finds that no "fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. In so finding, the Court concludes that Medlock has not proffered sufficient evidence to support her contention that the IRS abused its discretion in deciding not to withdraw the Notice of Intent to Levy. *See Goza,* 114 T.C. at 181–82 ("where the validity of the underlying tax liability is not properly at issue, the Court will review

the Commissioner's administrative determination for abuse of discretion").

13. In particular, Medlock has raised no genuine issue of material fact regarding whether: (1) the IRS Appeals Officer fully considered Medlock's "offers of collection alternatives," including her proposal that she be permitted to sell her daycare business to her mother; (2) the IRS Appeals Officer obtained verification that all of the requirements of applicable law had been met; and (3) the IRS Appeals Officer fully considered all issues raised by Medlock during the CDP Appeal, including the potential impact of the levy on Medlock's customers.

*Appeals Officer Rich Did Not Abuse Her Discretion In Concluding That The IRS Could Proceed With Collection Action*

**The IRS Fully Considered Medlock's Proposal to Allow Her to Sell the Day Care Business to Her Mother**

14. Medlock first contends that the IRS failed to address her request that she be permitted to sell the day care business to her mother, in alleged violation of 26 U.S.C. § 6330(c)(3)(B). (Complaint, ¶ 16).

15. Medlock, however, neglects to mention the attachment to the Determination Notice, which specifically refers to her proposal:

"During Appeals consideration, you indicated that your business was in the process of being sold, but had not been finalized as [of] yet, pending state qualifications for the new buyer on the childcare business. During Appeals consideration, the business was not sold. During Appeals consideration, you did come into compliance for two consecutive quarters so that an offer in compro-

mise could be submitted. No offer was received during Appeals consideration." (Exhibit No. 6, Complaint, p. 27).

16. The above statement establishes that Appeals Officer Rich did in fact consider Medlock's proposal to sell the day care center, but that no sale took place during the nearly nine (9) month period that she was assigned to this case, i.e., from *May 16, 2001* until *February 1, 2002*, when the IRS issued the Determination Notice. (Rich Decl., ¶¶ 2 and 14, Rich Reply Decl., ¶ 4, and Exhibit P, Case Activity Records).

17. The facts clearly indicate that Appeals Officer Rich gave Medlock more than sufficient time to propose and implement a collection alternative. Medlock, however, failed to avail herself of that opportunity. Medlock effectively failed to prosecute her CDP Appeal, leaving the Appeals Office with no alternative but to deny the appeal and sustain the Service's February 27, 2001 Notice of Intent to Levy. Moreover, for *over two and one-half years before* filing the CDP Appeal, Medlock had been making the **same proposal** to resolve her employment tax problems to a succession of IRS revenue officers, dating back to *October 28, 1998*. (Exhibits C, G, and H).

18. It cannot reasonably be disputed that Appeals Officer Rich abused her discretion by not giving Medlock additional time to sell the day care business to her mother. Based upon Medlock's prior track record, there is no indication that additional time would have made any difference, other than to further postpone Medlock's final day of reckoning with her unpaid employment tax obligations.

19. Moreover, from the time that the IRS opened a collection file regarding Medlock's unpaid employment tax liabilities, the unpaid balance of those liabilities

has greatly increased. In addition to owing unpaid employment tax liabilities for the subject periods, Medlock had incurred employment tax liabilities for numerous **additional tax periods** at the time of the CDP hearing, so that the unpaid balance of Medlock's *assessed* tax liabilities was *$199,901.58*, rather than merely the *$25,582.50* of unpaid assessed and accrued tax liabilities listed in the Service's Notice of Intent to Levy dated February 27, 2001. (Rich Reply Decl., ¶ 3.a., and Exhibits J, K, L, and M).

20. Consequently, Appeals Officer Rich did not abuse her discretion in determining that waiting for an additional unknown, indeterminate period of time for Medlock finally to sell her day care business to her mother was not in the interest of the efficient collection of taxes. *See Sillavan v. United States*, 2002 WL 400804, *5–6, 89 A.F.T.R.2d 2002–2310, 2002–1 USTC ¶ 50,-236 (N.D.Ala. Jan. 11, 2002) (Appeals Officer did not abuse his discretion in finding that waiting for sale of taxpayer's residence was not in interest of efficient collection of taxes, where taxpayer recently had transferred his legal interest in residence to his wife and the two IRA accounts on which IRS levied were the only assets to which plaintiff held unclouded title). *See also AJP Management v. United States*, 2000 WL 33122693 at *2–3 (Appeals Officer did not abuse his discretion in rejecting plaintiff's suggestion that IRS select an installment plan or offer-in-compromise to collect plaintiff's overdue taxes, and that IRS wait for one full tax quarter after CDP hearing to allow taxpayer to show its compliance with employment tax requirements, where "plaintiff had a long history of non-compliance with federal payroll tax laws, had failed to pay payroll [taxes] for every quarter since its inception in May 1997, and was not in compliance for the then-current quarter"); *Compucel Service Computer Corporation v. Commissioner of Internal Revenue*, 2002 WL 442254, *2–3 n. 6, 89 A.F.T.R.2d 2002–1286, 2002–1 USTC ¶ 50,284 (D.Md. Feb. 15, 2002) (Appeals Officer did not abuse his discretion by "failing" to accept taxpayer's proposals to "write off" the majority of its tax debts through an offer in compromise or to enter into an installment payment plan that, "even if complied with, would effectively defer the payment of [taxpayer's] obligations for a long, long time, if not forever," as such payments would not even satisfy the interest accruing on the taxpayer's liabilities);[7] *MRCA Information Services v. United States*, 145 F.Supp.2d 194, 199–200 (D.Conn.2000) (Appeals Officer did not abuse his discretion in rejecting taxpayer's offer to enter into installment payment agreement, where it had entered into two previous installment agreements with IRS and defaulted on both of them, President of taxpayer stated at CDP hearing that taxpayer was unable to make any sort of lump sum payment to IRS to show its good faith regarding implementation of

---

7. The District Court in *Compucel* made the following observation, which is directly applicable to this case:

"In brief and stark terms, the statute [26 U.S.C. § 6330] permits a taxpayer who does not deny that he owes a tax liability to block IRS collection by levy for so long as it may take to provide a Due Process Hearing and for the judicial process to be completed. In the instant case, Compucel, with substantial and increasing withholding and employment tax obligations in default since 1994, has been able to block IRS levy actions into the year 2002. In practical terms, the Court must decide how much longer Compucel can continue to avoid paying its Form 941 tax liabilities, which are now approaching $1,000,000. In other words, this Court must decide how much longer Compucel can use its unpaid tax liabilities effectively as 'working capital.' In the opinion of this Court, seven years of tax deficit financing has been more than enough. The IRS should be free to proceed with vigorous collection action."
*Id.*, 2002 WL 442254, at *2.

proposed installment agreement, and taxpayer had not remained current in the payment of its payroll tax liabilities for that year).

**Appeals Officer Rich Obtained Verification That All of the Requirements of Applicable Law Were Met**

■ 21. The declarations of Appeals Officer Rich establish that she verified that the requirements of any applicable law and administrative procedure had been met prior to issuing the Determination Notice.

22. In particular, Appeals Officer Rich had no prior involvement with respect to Medlock's subject tax liabilities. (Rich Decl., ¶ 4).

23. Ms. Rich reviewed the Service's computerized transcripts of account pertaining to Medlock for the subject tax liabilities, and based upon her review of those transcripts, she determined that: (a) the subject tax liabilities were properly and timely assessed against Medlock; (b) the assessments of the subject tax liabilities were based upon tax amounts that Medlock reported as due and owing on Forms 940 and 941 that she filed with the IRS; (c) the IRS gave Medlock "notice and demand" for payment of the subject tax liabilities within sixty (60) days after the respective assessment dates, as required by 26 U.S.C. § 6303(a); and (d) on *February 27, 2001,* the IRS sent to Medlock, by certified mail, a Notice of Intent to Levy regarding the subject tax liabilities, along with notice of Medlock's right to file a CDP Appeal and to have an appeals hearing regarding the Notice of Intent to Levy, as required by 26 U.S.C. §§ 6330(a) and 6331(d)(2). (Rich Decl., ¶ 5). *See Pikover v. United States,* 2001 WL 1346670, at *4 (listing specific prerequisites for IRS to file notice of Federal tax lien against taxpayer and finding that IRS had satisfied all of them, by means of Appeals Officer's declaration).

24. Appeals Officer Rich arguably determined that a possible levy source existed in the event that she denied Medlock's appeal and the IRS subsequently levied on Medlock's property. *See e.g.,* 26 U.S.C. §§ 6331(f) and (j) (pertaining to uneconomical levies and requirement to investigate status of property before levy). Namely, the IRS had identified a business checking account, account no. 12037346, that Medlock maintained with Farmers & Merchants Bank. Revenue Officer Francine Huck, who had been assigned to collect the subject tax liabilities immediately before Medlock filed the CDP Appeal, informed Ms. Rich that, as of early 2000, substantial funds were being deposited into that account. (Rich Decl., ¶ 6; portions of Exhibits G and I, monthly bank account statements regarding Medlock's business checking account with Farmers & Merchants Bank).

■ 25. Nonetheless, Appeals Officer Rich was not required, during the CDP Appeal process, to determine whether the equity in Medlock's property was sufficient to yield net proceeds, per 26 U.S.C. § 6331(f), or to investigate the status of Medlock's property, per 26 U.S.C. § 6331(j). According to the plain language of the relevant statutory sections, these actions must be taken before a taxpayer's property may be levied upon by the IRS but are prematurely raised at this stage of the collection process. Appeals Officer Rich's alleged failure to perform those actions therefore does not constitute a violation of 26 U.S.C. §§ 6330(c)(1) or (c)(3)(A).,

**Appeals Officer Rich Fully Considered All Issues That Medlock Raised During the CDP Appeal, Including the Potential Impact of the Levy on Medlock's Customers**

26. Appeals Officer Rich considered *all* of the issues that Medlock raised during

her CDP Appeal. In this regard, the Determination Notice states: "your expressed concerns do not outweigh the need for the efficient collection of tax, and the levy action proposed is not more intrusive than necessary." (Exhibit No. 6, p. 26, Rich Decl., ¶ 15, and Exhibit A).

■ 27. Nonetheless, Appeals Officer Rich did not abuse her discretion *even if* she did not consider the impact of the levy on the day care center's customers. (Complaint, ¶¶ 23–24). Ms. Rich was not required to consider the impact of a possible levy on the customers of Medlock's day care center in issuing the Determination Notice. The customers of *any* business will be required to seek services elsewhere if the business is forced to close due to employment tax "pyramiding." If the Court were to accept Medlock's argument as to this issue, then the IRS would be unable to enforce against any recalcitrant employer the legal requirement to withhold and pay over employment taxes as employees are paid their wages.

■ 28. Furthermore, the Service need not accept a collection proposal in lieu of a levy whenever there is an indication that a levy may lead to the demise of the taxpayer's business. *See Kitchen Cabinets, Inc. v. United States*, 2001 WL 237384, *2–3, 87 A.F.T.R.2d 2001–1393, 2001–1 USTC ¶ 50,287 (N.D.Tex. Mar. 6, 2001) (IRS was not obligated to accept proposed installment agreement discussed at CDP hearing which called for taxpayer to make monthly payments of $5,000, although levy might lead to demise of taxpayer's business, since taxpayer provided no support for its ability to make such payments, taxpayer's own financial information indicated that it could not make such payments, and taxpayer was not paying its current employment tax liabilities as they accrued); *Cardinal Healthcare, Inc. v. United States*, 2002 WL 31002880, *7–8, 90 A.F.T.R.2d 2002–5782, 2002–2

USTC ¶ 50,582 (S.D.Ill. July 25, 2002) (mere fact that levy would force plaintiff to close its health care facility, require removal of all of its current residents, and cause 140 individuals to lose their jobs was not basis to grant plaintiff's CDP appeal, where evidence indicated that plaintiff could pay its tax liabilities in full and Appeals Officer had given plaintiff opportunity to provide updated financial statement and installment payment proposal, but plaintiff had failed to provide such documentation or to controvert Appeals Officer's preliminary finding that taxpayer could pay full amount of its tax liabilities).

■ 29. For all of the above reasons, Appeals Officer Rich did not abuse her discretion in issuing the Determination Notice dated February 1, 2002 to Medlock. Accordingly, the IRS properly issued the Notice of Intent to Levy dated February 27, 2001 to Medlock in the total amount of $25,582.50, and it is not required to release or withdraw that Notice.

30. By its Motion for Summary Judgment, the supporting declarations of Janice Rich and Richard G. Stack, the reply declaration of Ms. Rich, and the evidentiary material attached thereto, defendant has established that there is no genuine issue of material fact as to any of the causes of action asserted by plaintiff in the Complaint and that it is entitled to judgment in its favor as a matter of law. Therefore, the Motion for Summary Judgment filed by defendant is hereby granted.

31. Accordingly, plaintiff shall take nothing by way of her Complaint filed in this action, and Judgment shall be entered against plaintiff and in favor of defendant.

32. Any finding of fact deemed more appropriately to be a conclusion of law is incorporated herein as a conclusion of law.

**IT IS SO ORDERED.**

## *SUMMARY JUDGMENT*

The Motion for Summary Judgment filed by defendant, the United States of America, came on for decision before the Court, the Honorable James V. Selna, United States District Judge, presiding, on September 8, 2003. Based upon the Statement of Uncontroverted Facts and Conclusions of Law filed herein, and good cause appearing therefor,

IT IS ORDERED, ADJUDGED AND DECREED that:

1. Summary Judgment is hereby entered in favor of defendant and against plaintiff on the merits of plaintiff's Complaint filed in this action.

2. Accordingly, plaintiff shall take nothing by way of its Complaint filed in this action.

**IT IS SO ORDERED.**